# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

**Civil Action No. 2:23-cv-1858-SDW-AME**
**(Honorable Susan D. Wigenton, U.S.D.J.)**

---

MICHELE A. CORNELIUS,

*Plaintiff,*

v.

CVS PHARMACY, INC.,
NEW JERSEY CVS PHARMACY, L.L.C., AND
SHARDUL PATEL,

*Defendants.*

---

## Brief of Plaintiff Michele A. Cornelius
## in Opposition to Defendants' May 23, 2023 Motion
## (D.E. No. 9)

## July 3, 2023 Motion Day

---

Alex G. Leone
LEONE LAW LLC
195 Maplewood Avenue, P.O. Box 1274
Maplewood, New Jersey 07040
alex@juvenilejusticeattorney.com
(908) 787-5581

**Dated:** June 20, 2023

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES**..........................................................................iii

**ARGUMENT**..................................................................................................1

**I.    Defendants' motion is preempted by Congressional statute**..................................................................................1

**II.   The purported arbitration agreement is neither valid nor enforceable anyway**..........................................................8

    **A.    There was no "meeting of the minds."**........................8

        1.    There was no meeting of the minds on Defendants' misleading "training" documents...........................10

        2.    Defendants' numerous inconsistent statements regarding arbitration made a meeting of the minds impossible.........................................................12

        3.    Defendants' misleading "training" documents also contain several material misrepresentations.........................................18

    **B.    There is no "clear and unmistakable waiver of rights."**.......................................................................21

    **C.    The purported arbitration agreement is unconscionable and thus unenforceable**...................23

**CONCLUSION**...............................................................................................28

**CERTIFICATE OF SERVICE**................................................................29

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Abramson v. William Paterson Coll. of N.J.*,
    260 F.3d 265 (3d Cir. 2001) ……………………………………….....2

*Allstate N.J. Ins. Co. v. Lajara*,
    222 N.J. 129 (2015)………………………………………....10, 12, 22, 27

*Atalese v. U.S. Legal Servs. Grp., L.P.*,
    219 N.J. 430 (2014)…………………………………….…..……passim

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)…………………………………………….....20

*Bibby v. Phil. Coca Cola Bottling Co.*,
    260 F.3d 257 (3d Cir. 2001)……………………..……….…….…2, 4

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020)……………………………….………….....1, 3

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)……………………………………………….4

*Delta v. Harris*,
    189 N.J. 28 (2006)…………………………………….……….passim

*Ehleiter v. Grapetree*,
    482 F.3d 207 (3d Cir. 2007) …………………………….……...22

*First American Title v. Lawson*,
    177 N.J. 125 (2003)………………………………………….……18

*First Valley Leasing, Inc. v. Goushy*,
    795 F. Supp. 693 (D.N.J. 1992)………………………………….…27

*Flanzman v. Jenny Craig, Inc.,*
    244 N.J. 119 (2020) …………………………………………..…………22

*Flanzman v. Jenny Craig, Inc.,*
    456 N.J. Super. 613 (App. Div. 2018)…………………………….……19

*Garcia v. United States,*
    469 U.S. 70 (1984)…………………………………………………....…6

*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless*
    *U.S.,* 140 S. Ct. 1637 (2020)……………………………..………..………8

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
    139 S. Ct. 524 (2019)……………………………………….………5, 7

*Hurley v. Atlantic City Police Department,*
    174 F.3d 95 (3d Cir. 1999)……………..……………………………2, 3

*Kernahan v. Home Warranty Adm'r of Fla., Inc.,*
    236 N.J. 301 (2019)……………..……………………..………...passim

*Lehmann v. Toys 'R' Us, Inc.,*
    132 N.J. 587 (1993) ………………………………………...…..……..1, 2

*Leodori v. Cigna Corp.,*
    175 N.J. 293 (2003)…………………………………………..……15, 20

*Lesser v. Strubbe,*
    39 N.J. 90 (1963)…………………………………………………...…17

*Marshall v. Human Servs. of Se. Tex.,*
    No. 1:21-cv-529 (E.D. Tex. Feb. 7, 2023)…..…………………………4

*Martindale v. Sandvik,*
    173 N.J. 76 (2002)…………..……………………………….………26

*Muhammad v. County Bank of Rehoboth Beach, Del,*
    189 N.J. 1 (2006)………………………………………………….23, 25

iv

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002)…………………………………………..……4

*Nelson v. Adams USA, Inc.,*
    529 U.S. 460 (2000)……………………………………….……..…19

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998)………………………………………….………..2, 3

*Rodriguez v. Raymours Furniture Co.,*
    225 N.J. 343 (2016) ……………………….………22, 23, 24, 25, 26

*Rudbart v. N. Jersey Dist. Water Supply Comm'n,*
    127 N.J. 344 (1992)……..……………………………….......23

*Seila Law LLC v. Consumer Financial Protection Bureau,*
    140 S. Ct. 2183 (2020)………………………………..……….6

*Silverman v. DiscGenics, Inc.,*
    2:22-cv-00354-JNP-DAO (D. Utah Mar. 13, 2023)……….……....4

*Skuse v. Pfizer, Inc.,*
    244 N.J. 30 (2020)…………………………………….…passim

*Smith v. Berryhill,*
    139 S. Ct. 1765 (2019)………………………………………....5

*Starnes v. Butler Cnty. Court of Common Pleas,*
    971 F.3d 416 (3d Cir. 2020)………..……………………....1

*State v. Moran*
    202 N.J. 311 (2010)………………………………….…….....14

*Stelluti v. Casapenn Enterprises,*
    203 N.J. 286 (2010)…………………………………………..23, 24

*Sylvain v. Attorney Gen. of U.S.*,
    714 F.3d 150 (3d Cir. 2013)…………………………..…………………..7

*United States v. Lewis*,
    802 F.3d 449 (3d Cir. 2015)…………………………….…………….19

*United States v. Scarfo*,
    41 F.4th 136 (3d Cir. 2022)…………………………………………...19

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 2022 (2022).  …………………………………..……………6

*Zirpoli v. Midland Funding, LLC*,
    48 F.4th 136 (3d Cir. 2022)……………………………………9, 17

## **Statutes**                **Page(s)**

9 U.S.C. § 401……………………………………………...………1, 4, 5, 6

9 U.S.C. § 402………………………………………………….………passim

42 U.S.C. § 2000e-2……………………………………….……………….3

N.J.S.A. 10:5-12……………………………………………………………3

N.J.S.A. 10:5-12.7……………………………………………...……7, 19

## **Other Authorities**        **Page(s)**

BLACK'S LAW DICTIONARY …………………………………..………4, 21

WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE……...14

THE WHITE HOUSE………………………………………………………7

**ARGUMENT**

Plaintiff Michele A. Cornelius ("Ms. Cornelius") offers the following opposition to the May 23, 2023 motion (D.E. No. 9) of defendants CVS Pharmacy, Inc., New Jersey CVS Pharmacy, L.L.C., and Shardul Patel ("Defendants").

**I.       Defendants' motion is preempted by Congressional statute.**

The plain text of the *Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021*, 9 U.S.C. § 402 ("the Act"), puts the lie to Defendants' effort to deny Ms. Cornelius her day in court.  The Act provides in relevant part:

> [A]t the election of the person alleging conduct constituting a sexual harassment dispute . . . , no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal . . . or State law and relates to . . . the sexual harassment dispute.[1]

Ms. Cornelius's claims easily satisfy each condition in the Act, and so at her election the purported arbitration agreement between the parties is neither valid nor enforceable here.[2]

***First***, Ms. Cornelius has straightforwardly alleged "conduct constituting a sexual harassment dispute."  *See* 9 U.S.C. § 402(a); *see also* 9 U.S.C. § 401(4).  The Complaint alleges that Defendants "target[ed] Plaintiff with severe and pervasive negative treatment, intentionally *because she is a woman*."[3]  *See, e.g.*, *Starnes v. Butler Cnty. Court of Common Pleas*, 971 F.3d 416, 427 (3d Cir. 2020) (recognizing that "[a] triable claim exists" when a plaintiff alleges that her sex was a "but for" cause of her employer's harassment (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1744 (2020)); *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 605 (1993) (same).

---

[1]      The Act "shall apply with respect to *any dispute* . . . that arises . . . on or after [March 3, 2022]."  9 U.S.C. §§ 401 & 402 (Statutory Notes) (emphasis added).

[2]      As discussed in Section II, separate from the Act, the purported arbitration agreement is neither valid nor enforceable anyway.

[3]      (*See, e.g.*, D.E. No. 1-1 ("Compl.") ¶ 15 (emphasis added)).

The harassment against Ms. Cornelius included but is not limited to Defendants' "treating women differently than men," "replacing [Ms. Cornelius] with a man while she was still on the job," "dismissing [her] questions or concerns with disrespectful responses," "abusing [her] with rude and unnecessary text messages," "intentionally overworking [her]," "destroying morale and undermining her with employees [she] managed," "minimizing [her] needs as an adult outside of work," and otherwise "demeaning . . . and treating her like a child."[4]  As the Court of Appeals has recognized, exactly that kind of harassing conduct—being "aggressively rude to a woman, [or] disparaging her or sabotaging her work"—constitutes sexual harassment in violation of Title VII when motivated by "a general hostility to the presence of women in the workplace."  *See Bibby v. Phil. Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2001); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("A trier of fact might reasonably find [sexual harassment] discrimination . . . [when it is] motivated by general hostility to . . . women . . . .")).

"Mr. Patel's unlawful discriminatory intent against women—and Plaintiff as a woman— was 'the motive behind' the hostile treatment" detailed in the Complaint,[5] so the Complaint alleges "conduct constituting a sexual harassment dispute."  *See* 9 U.S.C. § 402(a); *see, e.g., Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) (recognizing that a "hostile work environment claim on basis of sex [is] viable [even] where [the] conduct at issue,

---

[4]   (*See, e.g.*, Compl. ¶ 15).  The Complaint cites multiple, additional specific examples of such harassing conduct.  (*See, e.g.*, Compl. ¶¶ 18-20 (discussing Defendants' "discriminatory targeting of" Ms. Cornelius with "illogical and unfounded criticisms" of her work performance, which "prevented [her] from being promoted and receiving higher pay"); *id.* ¶ 21 (providing specific examples of the proposition that "Mr. Patel's treatment of women clearly contrasts with his treatment of men"); *id.* ¶¶ 25-28 (describing Defendants' "discriminatory choice . . . to treat Plaintiff with hostility because she is a woman" by "ignoring [Ms. Cornelius]'s resignation notices" for weekslong periods)).

[5]   (Compl. ¶ 16 (citing *Hurley v. Atlantic City Police Department*, 174 F.3d 95, 111 (3d Cir. 1999)).  Notably, under State law, "the perpetrator's intent is simply not an element of the cause of action" so Ms. Cornelius "need show only that the harassment would not have occurred but for her sex."  *See Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 605 (1993).

though lacking any sexual component or reference to [the] plaintiff's sex, could, in context, reasonably be interpreted as having been directed at [her] because of sex" (citing *Howley v. Town of Stratford*, 217 F.3d 141, 145 (2d Cir. 2000)).  Ms. Cornelius's citation to "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace"—such as when Defendants "permitted a male employee . . . to engage in conduct and receive benefits . . . denied [Ms. Cornelius]"[6]—further supports the unavoidable inference of sexual harassment discrimination.  *See, e.g.*, *Oncale*, 523 U.S. at 80-81.

Because Defendants' "unlawful discriminatory intent against women—and Plaintiff as a woman—was 'the motive behind' th[is] hostile treatment,"[7] there is no basis for Defendants' assertion that their conduct is "not . . . sexual harassment."[8]  *See, e.g.*, *Oncale*, 523 U.S. at 80. Defendants offer—with a citation to an inapposite and unpublished "age discrimination" case— only a single conclusory assertion on this point.[9]  It is unclear, therefore, whether Defendants' misguided assertion that Ms. Cornelius "does not allege . . . sexual harassment"[10] is based on the assumption that Mr. Patel apparently did not exhibit overt sexual desire.  Regardless, the Supreme Court has unanimously recognized that "*harassing conduct need not be motivated by sexual desire* to support an inference of discrimination on the basis of sex."  *See Oncale*, 523

---

[6]     (Compl. ¶ 21; *see also, e.g.*, *id.* ¶¶ 31-37 (documenting Ms. Cornelius's and another female employee's complaints to a CVS Regional Manager named Mr. Brauer regarding Mr. Patel's "discriminating against them because they are women")).

[7]     (Compl. ¶ 16 (citing *Hurley*, 174 F.3d at 111)).

[8]     (*See* D.E. No. 9-1 ("Defs. Br.") at 19 n.5 (internal pagination)).  In this same footnote and throughout their brief, Defendants attempt to recast Ms. Cornelius's claims as "gender" identity discrimination.  (*See, e.g.*, Defs. Br. at 1).  It is not clear what Defendants mean by "gender," or why they have substituted it for "sex," but the Complaint unequivocally alleges discrimination "because of . . . *sex*."  (*See, e.g.*, Compl. ¶ 14 (emphasis added) (citing 42 U.S.C. § 2000e-2(a)(1); N.J.S.A. 10:5-12(a)); *id.* ¶¶ 54, 58 & 62); *cf. Bostock v. Clayton County*, 140 S. Ct. 1731, 1746-47 (2020) ("[H]omosexuality and transgender status are distinct concepts from sex.").

[9]     (*See* Defs. Br. at 19 n.5).

[10]     (Defs. Br. at 19 n.5).

3

U.S. at 80 (emphasis added); *Bibby*, 260 F.3d at 262 ("[H]arassment might also be found where there is no sexual attraction but where the harasser displays hostility to the presence of a particular sex in the workplace.").   Accordingly, Ms. Cornelius straightforwardly alleges "conduct constituting a sexual harassment dispute." *See* 9 U.S.C. § 402(a); 9 U.S.C. § 401(4).[11]

**Second**, Ms. Cornelius's is "a case which is filed under Federal . . . or State law"[12] and "relates to the . . . sexual harassment dispute."[13] *See* 9 U.S.C. § 402(a).  Defendants agree.[14]

**Third**, the instant dispute is undeniably a "dispute . . . that ar[ose] . . . on or after Mar[ch] 3, 2022." *See* 9 U.S.C. §§ 401 & 402 (Statutory Notes).  Although Ms. Cornelius's hostile work environment *claim* accrued prior to her separation from employment on November 4, 2021,[15] *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-18 (2002), the instant *dispute* arose when Ms. Cornelius filed a charge with the Equal Opportunity Employment Commission ("EEOC") on August 22, 2022 (or timely filed this lawsuit thereafter).  *See, e.g.*, *Silverman v. DiscGenics, Inc.*, 2:22-cv-00354-JNP-DAO, 5 (D. Utah Mar. 13, 2023) (distinguishing "dispute" and "claim" under the Act and citing *Dispute*, BLACK'S LAW DICTIONARY (11th ed. 2019)).   In other words, "[t]he instant dispute arose . . . by filing [a] complaint[]."  *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 837 (1986); *Marshall v. Human Servs. of Se. Tex.*, No. 1:21-cv-529, 7 (E.D. Tex. Feb. 7, 2023) (recognizing that the Act does not apply to claims that "were *filed* before its enactment" (emphasis added)).  This commonsense conclusion makes even more sense in light of the Supreme Court's recognition, in this context, that "[w]hen a dispute arises" there are questions of "merits" and "arbitrability"—which are not possible when

---

[11]    As explained above, this straightforward allegation encompasses "conduct constituting a sexual harassment dispute . . . under Federal . . . [*and*] State law." *See* 9 U.S.C. § 402.
[12]    (*See, e.g.*, Compl. ¶¶ 53-64).
[13]    (*See, e.g.*, Compl. ¶¶ 15-16 & 40).
[14]    (*See, e.g.*, Defs. Br. at 1, 6 & 17).
[15]    (Compl. ¶ 28).

a claim merely accrues in the abstract, particularly when unbeknownst to the party holding it. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019).

Because the Act provides that it "shall apply with respect to *any dispute* . . . that arises . . . on or after [March 3, 2022]," 9 U.S.C. § 401 (Statutory Note) (emphasis added), it must apply to the instant dispute. *See, e.g.*, *Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019) ("Congress' use of the word 'any' suggests an intent to use that term expansively."). Defendants' offer only a single, conclusory sentence to the contrary—and they cite several cases that actually support application of the Act in this case.

- In *Woodruff v. Dollar General Corporation*, the plaintiff "filed her Charge of Discrimination with the EEOC" in 2019 and filed a complaint in court in 2021. No. 21-cv-1705-GBW, 6 (D. Del. Dec. 19, 2022). The *Woodruff* court then concluded, "*All* of these dates are before March 3, 2022, when the [Act] was enacted," ruling that the Act did not apply. *See id.*

- In *Steinberg v. Capgemini American, Inc.*, the plaintiff argued that the "dispute arose when [the defendant] filed its [m]otion raising the arbitration clause as an affirmative defense on April 4, 2022," but the court distinguished a "dispute of sexual harassment" from "a dispute regarding arbitrability" and rejected that argument. *See* No. 22-cv-489-JRS, 4 (E.D. Pa. Aug. 16, 2022). In so ruling, the *Steinberg* court suggested, correctly, that a *dispute* arises when a claim is "*filed*." *See id.* (emphasis added).

- *Settle v. Securitas Security Services, USA, Inc.*, an unpublished state-court opinion, addressed only "the accrual of [the] plaintiff's claim" and offered the following proposition that is not currently controverted: "[T]he [Act] applies to claims that accrued after its effective date." *See* No. A-0723-22 (N.J. App. Div. April 12, 2023).

5

- In *Rourke v. Herr Foods Inc.*, like *Woodruff*, the plaintiff's claim accrued, *and* he filed his claim initiating a *dispute*, before the effective date of the Act.  *See* No. A-2567-21, 2022 (N.J. App. Div. Oct. 26, 2022) (The "plaintiff's sexual harassment claim arose no later than December 9, 2021, the date he filed his complaint[.]").

- Finally, *Zuluaga v. Altice U.S.* is indistinguishable on that same dispositive point:  The "plaintiff's sexual harassment claim arose no later than October 27, 2021, the date she filed her complaint."  *See* No. A-2265-21, 15 (App. Div. Nov. 29, 2022).

In contrast to those cases, the instant dispute arose when Ms. Cornelius filed a charge with the EEOC on August 22, 2022 (or timely filed this lawsuit thereafter)—well after the effective date of the Act in March 2022.[16]  *See* 9 U.S.C. §§ 401 & 402 (Statutory Notes).

To the extent Defendants attempt to render the word "dispute," or any of the Act's terms, "dead letters," the Court should reject Defendants' contrived position and rule such "that effect is given to all provisions, so that no part [of the Act] will be inoperative or superfluous, void or insignificant."  *See, e.g.*, *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 2022 (2022).  "Canons of construction indicate that terms connected in the disjunctive in this manner be given separate meanings."  *See Garcia v. United States*, 469 U.S. 70, 73 (1984).  Yet Defendants apparently offer "no construction that would give effect to both provisions"—"dispute or claim"—"making the redundancy [that would follow from their position] both inescapable and unilluminating."  *See Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2210 (2020).[17]

---

[16]  (Compl. ¶ 2).
[17]  For what it's worth, Defendants themselves distinguish the words "claims" and "disputes" and affirm in their "Arbitration of Workplace Legal Disputes" document, "[A]rbitration is a . . . means for resolving workplace legal disputes."  (*See, e.g.*, D.E. No. 9-3 at 1 (internal pagination)).  Of course, there is no dispute for *arbitration* to "resolv[e]" prior to the filing of a charge, complaint, or similar document.  *See Henry Schein, Inc. v. Archer & White*

6

"In addition to this textual problem, [Defendants'] argument runs afoul of plain logic:"  It would make absolutely no sense for Congress to deny victims of sexual assault and harassment who initiate disputes *after* the effective date of the Act "access to justice in the courts"[18] simply because their claims first became actionable before that date.[19]  *See Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 160 (3d Cir. 2013).

By the terms of Defendants' own purported arbitration agreement, the Act applies,[20] so Ms. Cornelius respectfully requests that the Court order that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to [this] case."  *See* 9 U.S.C. § 402(a).[21]

---

*Sales, Inc.*, 139 S. Ct. 524, 527 (2019).  Hence by Defendants' own understanding of the words in the Act, Ms. Cornelius's election not to arbitrate is effective.  *See id.*; 9 U.S.C. § 402(a).

[18]    *See Remarks by President Biden at Signing of H.R. 4445,* "*Ending the Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021*," THE WHITE HOUSE (Mar. 3, 2022, 5:42 p.m.); *Remarks by Vice President Harris at Signing of H.R. 4445, "Ending the Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021*," THE WHITE HOUSE (Mar. 3, 2022, 5:42 p.m.) ("The legislation the President will sign today will end forced arbitration . . . and almost equally as important, it will apply retroactively . . . — invalidating every one of these agreements, no matter when they were entered into.").

[19]    As observed above, a "dispute" is not possible when a claim merely accrues in the abstract unbeknownst to the party holding it.  *See Henry Schein*, 139 S. Ct. at 527; (D.E. No. 9-3 at 1 (internal pagination) (Defendants recognizing that "arbitration is a . . . means for resolving workplace legal *disputes*") (emphasis added)).

[20]    (*See* D.E. No. 9-3 at 1 & 2 (internal pagination) ("Also excluded from this Policy are disputes that may not be subject to a pre-dispute arbitration agreement *as provided by* . . . *binding federal law* or legal authority." (emphasis added))).

[21]    Because Ms. Cornelius's election not to arbitrate is based on and does not contravene federal law, *see* 9 U.S.C. § 402(a), N.J.S.A. 10:5-12.7 requires the same result.  *See, e.g.*, *Antonucci v. Curvature Newco, Inc.*, 470 N.J. Super. 553, 565 (App. Div. 2022) (recognizing that "[o]ne of the procedural rights under [NJ]LAD is the right to pursue an action in court to be heard before a jury"); (Defs. Br. at 18 (incorrectly asserting that "Section 12.7 is preempted")).

**II.      The purported arbitration agreement is neither valid nor enforceable anyway.**

Several independently dispositive and interrelated reasons establish that Defendants'

purported arbitration agreement is of no effect:

(A)      There was no "meeting of the minds" on Defendants' convoluted, misleading, and
internally inconsistent series of "training" documents;

(B)      any alleged waiver of the constitutional right to a jury trial was unclear and
ambiguous at best; and

(C)      the purported arbitration agreement is unconscionable, unfairly favoring
Defendants in fatal respects.

**(A)      There was no "meeting of the minds."[22]**

Defendants conspicuously fail to specify *what* they claim constitutes their purported

arbitration agreement with Ms. Cornelius.  For instance, one immediately wonders whether it

could be the "fifth slide of the training" regarding which Defendants claim Ms. Cornelius

"clicked" "Yes,"[23] or perhaps it was "continuing . . . employment and choosing not to opt-out,"[24]

or both.  If both, or either, why would Defendants' "acknowledgement" misleadingly assert that

the purported arbitration policy[25] "applies to me" before "Yes" was clicked and before

---

[22]      "Chapter 1 of the Federal Arbitration Act (FAA) permits courts to apply state-law
doctrines related to the enforcement of arbitration agreements."  *GE Energy Power Conversion
Fr. SAS, Corp. v. Outokumpu Stainless U.S.*, 140 S. Ct. 1637, 1643 (2020).
[23]      (*See* Defs. Br. at 6).
[24]      (*See* Defs. Br. at 10).
[25]      Importantly, Defendants do not have any one arbitration policy but, as described in the
following sections, a patchwork of inconsistent and incomplete statements regarding arbitration.
(*Compare, e.g.*, D.E. No. 9-5 at 7 (Defendants' assuring employees that arbitration of claims is
"voluntary"), *with* D.E. No. 9-3 at 2 (Defendants purporting to adhere an employee to a
mandatory arbitration agreement instantly simply because she "receives" a document).  As
distinct from the "Policy" (D.E. No. 3), the patchwork of inconsistent statements Defendants
apparently hope to apply to Ms. Cornelius in some combination is referred to as their "purported
arbitration policy."

employment was "continued?"[26]  "[T]here must be a meeting of the minds for an agreement to
exist before enforcement is considered," *Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236
N.J. 301, 319 (2019), and Defendants, as "[t]he party urging the enforcement of the [purported]
arbitration agreement," *see Parilla v. IAP Worldwide Servs. VI, Inc.*, 368 F.3d 269, 288 (3d Cir.
2004), bear the "burden of legally proving" it, *see Barnes v. P. D. Manufacturing Co., Inc.*, 117
N.J.L. 156, 162 (1936).[27]  There is no clarifying analysis on this crucial question anywhere in the
documents Defendants appended to their motion, which tellingly fail to mention a meeting of the
minds at all.  That omission alone is dispositive.

As explained in the following sections, Defendants' morass of confusingly "embedded"[28]
documents includes a series of misleading and internally inconsistent representations that made a
"meeting of the minds" and "[m]utual  . . . understanding of the [purported] terms" impossible.
*See Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 442 (2014).  "Mutual assent requires
that the parties have an *understanding* of the terms to which they have agreed" and "*full
knowledge* of . . . legal rights *and* intent to surrender those rights." *See id.* at 443 (emphases
added).  Those conditions cannot plausibly be said to have obtained here, particularly because
Defendants' themselves misleadingly promised that "participation" in arbitration would be
"voluntary" and then failed to advise employees of their right to legal counsel, misdirecting
"Questions?" only to employees' "supervisor or . . . Human Resources."[29]

---

[26]     (*See* D.E. No. 9-4 ("Training") at 21 (ECF pagination) (providing, pre-
"acknowledgment," that "I . . . understand that [Defendants' "Policy"] applies to me.").
[27]     Under the legal standard Defendants assert (*see* Defs. Br. at 7 n.1 (citing *Guidotti v. Legal
Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013)), the Court also must "give
the benefit of all reasonable doubts and inferences to the party opposing arbitration."  *See Zirpoli
v. Midland Funding, LLC*, 48 F.4th 136, 140 n.6 (3d Cir. 2022).
[28]     (*See* Training at 3).
[29]     (D.E. No. 9-5 ("'Guide'") at 7 & 9 (internal pagination)).  On the confusing subjugation
of legal counsel to "my supervisor or Human Resources" elsewhere, see infra, Section II(A)2(7).

**1. There was no meeting of the minds on Defendants' misleading "training" documents.[30]**

Defendants began their defective effort to deny Ms. Cornelius access to court by misleadingly referring to their convoluted documents as "training"[31]—a "misnomer" that violates the Supreme Court of New Jersey's instruction that employers' "should not" refer to documents seeking a waiver of a fundamental right from an employee as "training."  *See Skuse v. Pfizer, Inc.*, 244 N.J. 30, 56-57 (2020).  The documents here could easily, and fatally, be "misconstrued as a routine component of a training program" for several reasons.  *See id.*

First, Ms. Cornelius's completion of the "training" occurred in the "LearningHub," which appears to list *only* such routine trainings,[32] and was surrounded by "Smoking Cessation Program Training" and "New Jersey CAP Training."[33]  Other adjacent trainings include "Annual Retail Compliance Training" and "Hazardous Waste Training."[34]  Second, the foremost slide of the relevant "training" obscurely designates it "Course 800305."[35]  Third, the "training" then states, "This course contains an embedded document that must be read in order to obtain the information needed to complete the acknowledge and receive credit for this training"— *intentionally or negligently omitting any mention of "one of the oldest and most fundamental of rights" Defendants hoped Ms. Cornelius would waive during this "training."*[36]  *See Allstate N.J.*

---

[30]     These documents are all in the record and will be cited as follows:  D.E. No. 9-3 ("'Policy'"), with internal pagination; D.E. No. 9-4 ("Training"), with ECF pagination; and D.E. No. 9-5 ("'Guide'"), with internal pagination.
         "Defendants" includes Mr. Patel only to the extent logically required by context.
[31]     (*See, e.g.*, D.E. No. 9-2 at 2 ¶ 8; Training at 3-4).
[32]     (*See generally* D.E. No. 9-6).
[33]     (D.E. No. 9-6 at 19 (ECF pagination)).
[34]     (D.E. No. 9-6 at 19 (ECF pagination)).
[35]     (Training at 2).
[36]     As discussed below (*see infra* Section II(A)2(7)) Defendants compound this intentional or negligent omission by their failure to disclose, in both the "Policy" and the "guide,"

*Ins. Co. v. Lajara*, 222 N.J. 129, 134 (2015).  Similarly, Defendants' inconsistent "guide"[37] to its purported arbitration policy—which was confusingly "embedded"[38] in the "training" but not viewable contemporaneously with it[39]—misleadingly states:  "Upon completion of this course, you will have a better understanding of . . . [w]hat arbitration is [and] . . . [t]he CVS . . . Arbitration . . . Policy"—again omitting any mention of the fundamental right Defendants hoped Ms. Cornelius would waive, *and* her right to seek legal counsel on it, and *obscuring* the "fundamental change in the manner in which potential disputes would be resolved" going forward.  *See Skuse*, 244 N.J. at 57.

Fourth, Defendants' purported "Policy" and inconsistent "guide" appear to the employee completing the "training" only as "embedded"[40] documents that were not viewable to, or reviewable by, the employee at the time Defendants required "acknowledgement" of them:  "In order to complete the acknowledgement and receive credit for this course, *close out of this PDF* . . . and click 'Next' to access the acknowledgement."[41]  Defendants reiterate this unfair and confusing "training" aspect in their filings:  "*After* reviewing the Arbitration Policy Guide, a colleague must *return* to the . . . Training Course slides in order to *[then]* complete the

---

employees' right to seek legal counsel on Defendants' purportedly-instant, unconscionable contract of adhesion.  (*See infra*, Section II(C)).

[37]    "Guide" is scarequoted because its confusing and inconsistent statements make it anything but a legitimate guide.  (*See, e.g.*, *infra*, Section II(A)2).

[38]    (*See* Training at 3).

[39]    (*See, e.g.*, *infra*, notes 41-42 and accompanying text (discussing Defendants' unfair choice to require employees to "close out of" the documents containing Defendants' statements on arbitration before being allowed to "acknowledge[]" those statements).

[40]    (*See* Training at 3).

[41]    ("Guide" at 9 (emphasis added)).  As discussed below in Section II(A)2(2), the confusing nature of Defendant's "acknowledgement" itself shows there was no meeting of the minds.  Making matters worse, Defendants have actually have two putative acknowledgements confusingly written in different grammatical tenses and containing different statements.  (*Compare, e.g.*, "Guide" at 9 (instructing an employee on how to "receive credit for this course" and requiring that she "close out of this PDF"), *with* Training at 21 (omitting any mention of "credit" and the confusing "clos[ing] out of" "embedded" documents)).

[acknowledgement]."[42]   In other words, at the time of purported "acknowledg[ment]" of the "Policy," Ms. Cornelius was not "able to review and print" it.   *See Skuse*, 244 N.J. at 40.[43] Finally, Defendants' "training" ends:  "You have now completed the arbitration of Workplace Legal Disputes Training.  You may exit the course."[44]   This "routine" language signals anything but "a fundamental change in the manner in which potential disputes would be resolved," *see Skuse*, 244 N.J. at 57, and further "embed[s]"[45] Defendants' legally-defective effort to contravene "one of the oldest and most fundamental of rights."  *See Allstate*, 222 N.J. at 134.

### 2. Defendants' numerous inconsistent statements regarding arbitration made a meeting of the minds impossible.

Defendants' trainwreck of "training" documents "confusingly and unpredictably shifts between" inconsistent propositions on important arbitration-related provisions.  *See, e.g.*, *Kernahan*, 236 N.J. at 320.  The following is a non-exhaustive list of seven clear examples:

(1)   ***"Voluntary" v. Instant Adhesion.***   Defendants' "Policy" states, "Employees accept this Policy by continuing their employment after becoming aware of the Policy."[46]

Defendants' "guide" makes an inconsistent statement—that the employee is bound to

---

[42]   (*See* D.E. No. 9-2 at 4 ¶ 11).

[43]   Defendants assert that "a colleague may print the Arbitration Policy Guide and the Arbitration Policy . . . ."  (D.E. No 9-2 ¶ 15).  But this alleged permission to print is mentioned nowhere in Defendants' "training" documents:  *Those documents actually state that printing is not allowed without "Prior Written Approval."*  (*See, e.g.*, "Policy" at 1-4).

As Defendants implicitly recognize in citing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.* (*see* Defs. Br. at 7 n.1), Ms. Cornelius "must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity" of the purported arbitration agreement (in the event that the Court is not already persuaded that it is preempted under Federal law, *see, e.g.*, 9 U.S.C. § 402(a), or invalid under State law).  *See* 716 F.3d 764, 774 (3d Cir. 2013).  The factual dispute Defendants raise regarding printing without "Prior Written Approval" (*see, e.g.*, Defs. Br. at 5) is one example subject to such discovery.  *See id.*

[44]   (*See* Training at 22).

[45]   (*See* "Guide" at 3).

[46]   (*See* "Policy" at 1).

12

arbitration from when she "first views *or [even] receives*" the "Policy"[47]—and then immediately contradicts both when it declares "participation" in arbitration "to be voluntary."[48]   Defendants' claim to have a "voluntary" policy—amplified by its express desire to "*want*" to have a voluntary policy—is inconsistent with their earlier claim that the purported policy applies merely because an employee "receive[d]" it. *See, e.g.*, *State v. Moran*, 202 N.J. 311, 323 (2010) (observing that "voluntary" is part of the same definition as "deliberate" and "conscious motion of the will" (citing WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (2001)).[49]

(2)   ***"Acknowledge" v. "Agree."***   Defendants' "guide" states, "Colleagues will be asked to acknowledge *and agree* to the policy,"[50] but its "acknowledgement" itself ends, "Click the YES button to confirm your acknowledgment," with "*no reference to any agreement*" at that crucial "click" point.[51]   *See Skuse*, 244 N.J. at 60 (citing *Leodori v. Cigna Corp.*, 175 N.J. 293, 297 (2003)).   This inconsistency is particularly significant because the words "acknowledge" and "agree" are distinct and enforcement of an arbitration agreement requires that Ms. Cornelius "affirmatively had *agreed*" to its provisions with an "unmistakable indication."   *See, e.g.*, *Leodori* 175 N.J. at 307. Defendants' "confusingly and unpredictably shift[ing] between" *agreement* and

---

[47]   (*See* "Guide" at 7 (emphasis added)).

[48]   (*See* "Guide" at 8).

[49]   As suggested in Section II(A)2(3), and then analyzed in Section II(C), Defendants' oppressively one-sided "opt out" policy does not support its misleading assertion that "participation" in arbitration is "voluntary."   Simply having received a policy without understanding its convoluted contents, and then taking no action, cannot legally be construed as "voluntary" "participation."   *See, e.g.*, *State v. Moran*, 202 N.J. 311, 323 (2010).

[50]   ("Guide" at 8).

[51]   (*See, e.g.*, Defs. Br. at 6 (apparently reducing the entire purported arbitration agreement to when "the colleague clicked 'Yes' on the fifth slide"); *see also, e.g.*, D.E. No. 9-2 at ¶ 16 (fallaciously conflating "agreed and acknowledged")).

13

*acknowledgment, see Kernahan*, 236 N.J. at 320, shows there could not be a "*clear and unmistakable*" agreement to arbitrate. *See Skuse*, 244 N.J. at 48 (citing *Atalese*, 219 N.J. at 444).[52]

(3)   ***Opt out?***   Tellingly, Defendants' two most important documents—their "Policy" and the document they apparently think binds Ms. Cornelius to the "Policy," the "acknowledgment"[53]—say nothing about opting out.  The remaining inconsistencies in any purported opt-out policy are discussed below in the context of Defendants' inconsistent statements on retaliation and then with respect to unconscionability.

(4)   ***Retaliation?***   Defendants' "non-retaliation" provision in their "Policy" states, "It is against CVS Health policy for any Employee to be subject to retaliation he or she exercises his or her right to assert claims under this Policy or to challenge this Policy."[54]  **The "Policy" does not disclose that employees cannot be retaliated against for opting out;[55] *and* Defendants' purported "acknowledgement" says nothing about retaliation.[56]**  Defendants "guide," on the other hand, does not mention that Defendants cannot retaliate against an employee "if he or she exercises his or her right to assert claims under th[e] Policy or to challenge th[e] Policy."[57]  The "guide" does ambiguously disclose that Defendants "will not *tolerate* retaliation against any colleague who decides to opt out:"[58]  But whereas Defendants claim

---

[52]   Notably, the agreement that used the term "acknowledgment" and was upheld in *Skuse* did not confusingly shift between "agreement" and "acknowledgment."  *See* 244 N.J. at 60-61.
[53]   (*See infra*, note 102 (citing "Policy" (D.E. No. 3) and Training, (D.E. No. 9-4 at 21)).
[54]   ("Policy" at 4).
[55]   (*See generally* "Policy").
[56]   (*See* Training 21; *see also* "Guide" at 9 (Defendants' second "acknowledgement" confusingly written in a different grammatical tense and containing different statements)).
[57]   ("Policy" at 4).
[58]   (Guide at 7 (emphasis added)).  "*Tolerate* retaliation" by whom—itself?

simply not to "tolerate retaliation" in that instance, they distinguish other instances of retaliation as actually "against CVS Health policy" without making any such disclosure in the "guide."  As with the purported policy's unclear applicability to classes of claims and employees,[59] no document provides a clear and complete statement of Defendants' alleged non-retaliation policy—nor can any such policy be "clear and understandable" amongst the multiple incomplete and inconsistent statements on the topic.  *See, e.g.*, *Atalese*, 219 N.J. at 446.[60]

(5)     ***"Which claims?"***  In its "guide," Defendants state:  "The CVS Health Arbitration of Workplace Legal Disputes Policy applies to *all legal disputes* between" Defendants and Ms. Cornelius "related to [her] employment . . . or the termination of the [her] employment," adding a full stop, without noting until later that there are numerous important exceptions.[61]  Defendants' "Policy," on the other hand, states: "*This Policy does not apply* to claims [falling into four broad classes of legal disputes]"—after beginning a sentence on which claims *are* covered with a confusing "except" clause.[62]

---

[59]     (*See infra*, Section II(A)2(5) & (6)).

[60]     Making matters worse, Defendants' statements during this litigation are not consistent with the statements in its "training" documents and so compound the lack of clarity of any purported non-retaliation policy.  (*Compare, e.g.*, Defs. Br. at 12 (asserting that Defendants "*assured* [Ms. Cornelius] that if she opted out, there would be *no repercussion* or retaliation (emphases added)), *with* Training at 21 (Defendants' "acknowledgment" omitting any mention of retaliation) *and* "Policy" at 4 (omitting any prohibition on retaliation for opting out, and in fact failing to mention opting out at all)).

[61]     ("Guide" at 7).   Separate and apart from that definitive statement, Defendants acknowledge elsewhere in their guide that a supposedly "small group of legal claims are also excluded"—but their list of these claims in the "guide" ("claims for unemployment insurance, workers compensation benefits and claims under an employee benefit plan") does not match the list of such claims in the "Policy" and omits claims for "state disability insurance."  (*See* Policy at 2).  Defendants thus compound the inconsistency with more inconsistency.

[62]     (*See* Policy at 1-2 (emphasis added)).  The false and misleading statement in Defendants' "guide" that the purported arbitration "policy does not apply to general day-to-day workplace concerns" is addressed specifically below in Section II(A)3.

Defendants then provide another confusing variation on an exception elsewhere.[63]
**No document provides a clear and complete statement of the purported policy's applicability to, or exceptions regarding, claims**; and such applicability and exceptions were certainly not "clear and understandable." *See, e.g.*, *Atalese*, 219 N.J. at 446.  And as if it were not already confusing enough, the "Policy" then provides that it "does not prohibit . . . filing . . . [a] complaint with *any federal . . . office*"—language which, with "the benefit of all reasonable doubts and inferences to the party opposing arbitration," straightforwardly permits this lawsuit.  *See Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 140 n.6 (3d Cir. 2022). [64]

(6)     ***"Which employees?"***  As just observed, Defendants' "guide" states that the purported policy "applies to *all* legal disputes between CVS Health and a colleague related to the colleague's employment," adding a period, without mentioning the massive exception qualifying the class of employees to whom the purported policy applies: "This Policy applies to and forms a mutually-binding contract . . . *except [for]* those employees subject to a collective bargaining agreement[.]"[65]  Defendants' "guide" either intentionally or carelessly fails to disclose this exception anywhere,[66] despite the "Policy's" confusingly shifting to include the massive exception on the first page in its "SCOPE."[67] **Again, no document provides a clear and complete statement of**

---

[63]     (*See* Policy at 2 ("except for claims for employee benefits under any benefit plan sponsored by the Company and covered by ERISA or funded by insurance")).
[64]     (*See* "Policy" at 2 (emphasis added); *see also, e.g.*, Defs. Br. at 7 n.1 (endorsing *Zirpoli*)).
[65]     The Policy then goes on to include an "unless" clause either on top of, or embedded in, the "except" clause.  ("Policy" at 1).  "[T]he meaning of the provision," like several others here, is not apparent from the manner in which it relayed information[.]" *See Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236 N.J. 301, 321 (2019).
[66]     (*See generally* "Guide").
[67]     (*See* "Policy" at 1).

**the purported policy's applicability to classes of employees**; and the applicability of the purported policy is expressed only in a "contradictory and confusing manner" across the "training" documents—which, because of Defendants' unfair choice to "embed" them, were not even reviewable contemporaneously.[68] *See, e.g.*, *Skuse*, 244 N.J. at 49 (citing *Kernahan*, 236 N.J. at 323-26).

(7)     ***Legal Counsel.***  Finally—and perhaps most importantly—in the "guide," Defendants instruct readers:  "If you have additional questions, please feel free to go to your supervisor or your Human Resources Business Partner," *conspicuously omitting any disclosure of the right to consult legal counsel*.[69]  **Defendant's "Policy" also fails disclose the right to legal counsel, as it entirely fails to mention opting out.[70]** Defendants' incoherent "acknowledgement," however, ominously requires that the reader "*will* raise any questions . . . to [a] supervisor or Human resources" and then lastly discloses that the reader "*may* seek independent legal advice *as well*"—leaving it unclear whether questions must first be raised with "my supervisor or Human resources."[71]  *See Skuse*, 244 N.J. at 57 (approving an employer's instruction to employees "that they *should* seek the advice of counsel" (emphasis added)). Defendants' misleading statements and omissions regarding the right to counsel alone suffice to invalidate any purported agreement.  *See, e.g., Atalese*, 219 N.J. at 443 ("Mutual assent requires that the parties have an understanding of the terms to which they have agreed" and "full knowledge of . . . legal rights and intent to surrender those rights." (emphases added)).

---

[68]     (*See supra*, note 39).
[69]     (*See, e.g.*, "Guide" at 9).
[70]     (*See generally* "Policy").
[71]     (*See* Training at 20).

Defendants' "contradictory and confusing" statements on such important provisions make clear that "there was no mutual assent," *see Skuse*, 244 N.J. at 49 (citing *Kernahan*, 236 N.J. at 326), particularly with "the benefit of all reasonable doubts and inferences to the party opposing arbitration." *See Zirpoli*, 48 F.4th at 140 n.6.[72]

### 3. Defendants' misleading "training" documents also contain several material misrepresentations.

Another class of fatal problems pervading Defendants' defective "training" documents is material misrepresentations. An "express or implied misrepresentation" of material facts "will undoubtedly furnish a sufficient ground to invalidate [a] contract." *See, e.g.*, *Lesser v. Strubbe*, 39 N.J. 90, 93 (1963) (citing 1 Story, EQUITY JURISPRUDENCE (13th ed. 1886)). In this case, Defendants' misrepresentations appear to have been an effort to disarm suspicion about Defendants' proposed arbitration agreement and therefore negate any meeting of the minds: A meeting of the minds is "accomplished by . . . explanatory comment[s] that *achieve[]* the goal of *apprising the* [other party] of her rights"—not by inducing her assent with half-truths or outright falsehoods. *See Kernahan*, 236 N.J. at 320 (emphases added) (citing *Atalese*, 219 N.J. at 445).

A straightforward example is Defendants' misrepresentation in its "guide" that the purported arbitration "policy does not apply to general day-to-day workplace concerns[.]"[73] But it is precisely those concerns on which Defendants now attempt to deny Ms. Cornelius the opportunity to be heard in this Court. *See, e.g.*, *Atalese*, 219 N.J. at 442 ("*[O]nly* those issues may be arbitrated which the parties have agreed shall be." (emphasis added)). As stated in the Complaint, Defendants' discrimination against Ms. Cornelius constituted a "hostile work environment *that [she was] dealing with every day*," which she documented in "over a dozen

---

[72]   (*See* Defs. Br. at 7 n.1 (citing *Guidotti*, 716 F.3d at 774)).
[73]   (*See* Guide" at 7).

complaints" to Defendants.[74] As if that were not enough, courts have recognized that employees face legally-actionable discrimination day-to-day—specifically including sex discrimination against women that affects their "day-to-day work environment." *See, e.g.*, *Gaines v. Bellino*, 173 N.J. 301, 313 (2002). As Defendants' foremost explanatory sentence on "[w]hat is covered by"[75] the purported arbitration policy, it is reasonable to infer that Defendants "inten[ded] that the [reader] rely on" the misrepresentation and in fact Ms. Cornelius did. *See, e.g.*, *First American Title v. Lawson*, 177 N.J. 125, 136-37 (2003). Assent induced by that misrepresentation cannot form the basis for a valid agreement. *See id.*; *Kernahan*, 236 N.J. at 317. The same logic applies to the following additional examples of misrepresentations.

Defendants list a number of the features of arbitration in their "guide" and assert, "These are all of the ingredients for what is called 'due process' of law."[76] "These" could not be "all of the ingredients" of due process—without notice, for example, *see, e.g.*, *Jones v. Flowers*, 547 U.S. 220, 226 (2006)—and Defendants' never specify what form of "due process" they are referring to anyway: Defendants' purported arbitration policy itself does not require "due process" beyond the "Employment Arbitration Rules and Mediation Procedures of the AAA,"[77] which is not coextensive with due process under the United States or New Jersey Constitution. *Compare, e.g.*, *Flanzman v. Jenny Craig, Inc.*, 456 N.J. Super. 613, 626 (App. Div. 2018) ("AAA adheres to [']due process['] . . . standards outlined in *the National Rules for the Resolution of Employment Disputes*." (emphasis added)), *with Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000) ("The Federal Rules of Civil Procedure are designed to further the due process of law *that the Constitution guarantees*." (emphasis added)). Defendants' own promise, therefore, requires

---

[74]     (Compl. ¶ 22 (quoting Compl. ¶ 40 (c); *id.* ¶¶ 29-41).
[75]     ("Guide" at 6).
[76]     ("Guide" at 5).
[77]     (*See* "Policy" at 3).

that Ms. Cornelius's "due process interests in having one's arguments heard in court" be upheld.  *See United States v. Scarfo*, 41 F.4th 136, 226 n.115 (3d Cir. 2022); *United States v. Lewis*, 802 F.3d 449, 462 (3d Cir. 2015) (recognizing a person's "right to his day in court" as "basic in our system of jurisprudence"); *Allstate*, 222 N.J. at 134.[78]

In addition, Defendants misrepresented that "[a]rbitration allows individual colleagues to make the same legal claims and recover the same remedies as they could in court."[79] Defendants' purported arbitration agreement, however, prohibits Ms. Cornelius from bringing certain claims, including for declaratory judgment that the purported arbitration agreement is "against public policy and unenforceable" under State law.  *See* N.J.S.A. 10:5-12.7(a).[80]   The purported arbitration agreement also limits the remedies available to Ms. Cornelius, preventing her from being awarded damages for Defendants' breaches of State law.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011).  Furthermore, Defendants could not honestly guarantee ex ante that Ms. Cornelius will be "allow[ed] . . .  the same remedies as . . . in court"[81] because arbitrators are sometimes limited in the remedial relief they can order in ways that District Courts are not.  *See, e.g.*, *Comedy Club, Inc. v. Improv West Associates,* 553 F.3d 1277, 1286 (9th Cir. 2009) (ruling that an "arbitrator exceeded the scope of his authority" in ordering certain

---

[78]     Defendants' purported arbitration policy also does not disclose the limits on appeals of decisions by arbitrators, *see, e.g.*, *Employment Arbitration Rules and Mediation Procedures*, AMERICAN ARBITRATION ASSOCIATION ("Arbitration decisions can only be appealed in limited circumstances.")—another respect in which Defendants' misstatements regarding "due process" invalidate any purported arbitration agreement.
        Ms. Cornelius separately objects on due process grounds to a single arbitrator belonging to a potentially-biased private organization having virtually-unreviewable authority over enforcement of her fundamental and civil rights.

[79]     ("Guide" at 6).

[80]     Defendants, asserting preemption under Federal law, say so themselves—directly contradicting the promise in the "guide" that Ms. Cornelius would be able "to make the same legal claims" under their purported arbitration policy. (*See* Defs. Br. at 18 ("Section 12.7 is preempted by the FAA")).

[81]     ("Guide" at 6).

remedies). Finally, in attempting to induce employees to agree to the purported arbitration policy, Defendants also misrepresented that arbitration would be "more comfortable" for them— but there is no reason to believe that misleading statement is true for anyone but Defendants.[82]

**(B) There was no "clear and unmistakable waiver of rights."[83]**

As Defendants recognize,[84] New Jersey law requires that there be "an explicit, affirmative agreement that unmistakably reflects the employee's assent" to arbitration. *See Leodori v. CIGNA Corp.*, 175 N.J. 293, 303 (2003). In attempting to satisfy that requirement, Defendants assert that the following sentence "clearly and unmistakably notified Plaintiff"[85] that she would be forever locked out of pursuing sex discrimination claims against them in court:

> [A]ny dispute between an Employee and CVS Health that is covered by this Policy ("Covered Claims") will be decided by a single arbitrator through final and binding arbitration only and will not be decided by a court or jury or any other forum, except as otherwise provided in this Policy.[86]

Immediately the ambiguous "this Policy" prohibits any meeting of the minds.[87] And before it is punctuated by the contradictory "except" clause,[88] that confusing sentence suggests only that "[c]laims . . . will not be *decided* by a court or jury or any other forum"[89] and neither defines what it means for a claim to be "decided" nor "*explain[s]* that the plaintiff is giving up her right to *bring* her claims in court." *See Atalese*, 219 N.J. at 447 (emphases added). In other

---

[82]    (*See* "Guide" at 5).
[83]    This proposition is true for the reasons discussed in Section II(A) in addition to the reasons discussed in this section and elsewhere.
[84]    (*See* Defs. Br. at 11).
[85]    (*See* Defs. Br. at 12 (citing *Atalese*, 219 N.J. at 442-47)).
[86]    ("Policy" at 1).
[87]    As discussed above (*see supra*, Section II(A)), "Defendants do not have any one arbitration policy but . . . a patchwork of inconsistent and incomplete statements regarding arbitration." (*See supra*, note 25).
[88]    (*See supra*, Section II(A) (discussing dozens of confusing and contradictory aspects of Defendants' trainwreck of "training" documents)).
[89]    ("Policy" at 1 (emphasis added)).

21

words, even if the sentence suggests that "a court or jury" cannot "*decide[]*" a claim, it is silent on whether the claim can be *brought* in court or before a jury at all:  "[A] person who enters into an arbitration agreement should understand that he is waiving his *right to prosecute* or defend his claim in a civil court or judicial forum."  *Kernahan*, 236 N.J. at 331 (emphasis added). The "decision" of a claim, if ever, comes only at the end of a legal process and is clearly distinct from its "prosecution"—a fact which CVS does not disclose, let alone explain, to any of the employees it sought to deny access to court.  *See id.*; *Decision*, BLACK'S LAW DICTIONARY (11th ed. 2019)  ("A judgment or decree pronounced by a court *in settlement* of a controversy submitted to it." (emphasis added)).  The above sentence does not "reflect that [Ms. Cornelius] agreed clearly and unambiguously" not to *bring* or *prosecute* claims in court *at all*.  *See, e.g.*, *Atalese*, 219 N.J. at 443.

In a similar vein, the provision quoted above ambiguously and confusingly suggests that "[c]laims . . . will not be decided by a court *or* jury *or* any other forum"[90] but it does not disambiguate between (a) "It is not the case that claims will be decided by a court, or jury, or any other forum" and (b) "Neither a court, nor a jury, nor any other forum will decide claims"— ambiguously leaving open the logical possibility that *one* of a "court or jury or any other forum" can "decide[]" a claim.  *See Atalese*, 219 N.J. at 447.  An example should illustrate the problem with that ambiguity:  "You cannot have vanilla *or* chocolate *or* strawberry ice cream—but you can have just vanilla!"  Defendants' purported "waiver-of-rights provision," therefore, is not "written clearly and unambiguously" and is thus not enforceable.  *See Skuse*, 244 N.J. at 49 (citing *Atalese*, 219 N.J. at 443).

---

[90]      ("Policy" at 1 (emphases added)).

As with many other subtle inconsistencies in their use of language, Defendants "confusingly and unpredictably shift[] between" the term "decided" in the provision quoted above and the term "resolve" in the "acknowledgement."[91]  *See, e.g.*, *Kernahan*, 236 N.J. at 320. As with the conceptually distinct "decided," none of Defendants' documents define "resolved." This omission is particularly significant because it is undisputed that arbitration or mediation can "*resolve* [a] dispute" even if first filed and litigated in court.  *See, e.g.*, *Ehleiter v. Grapetree*, 482 F.3d 207, 210 (3d Cir. 2007) (emphasis added)).  "Nowhere in the arbitration clause is there any explanation that [Ms. Cornelius] is waiving her right *to seek relief* in court for a breach of her statutory rights" *at all*, *see Skuse*, 244 N.J. at 49; Defendants, in other words, "did not *explain* that [Ms. Cornelius] had waived the rights to *pursue* [he]r claims before a judge or jury in court," *see Flanzman v. Jenny Craig, Inc.*, 244 N.J. 119, 137 (2020) (emphases added).

The provisions Defendants' claim "clearly and unmistakably"[92] waive "one of the oldest and most fundamental of rights," *see Allstate*, 222 N.J. at 134, are in fact "debatable, confusing[,] contradictory," and "misleading." *See Kernahan*, 236 N.J. at 308.

**(C)     The purported arbitration agreement is unconscionable and thus unenforceable.**

"[U]ndoubtedly, courts may refuse to enforce contracts, or discrete contract provisions, that are unconscionable."  *Rodriguez v. Raymours Furniture Co.*, 225 N.J. 343, 366 (2016) (citing *Muhammad v. County Bank of Rehoboth Beach, Del*, 189 N.J. 1, 15 (2006)).  "The unconscionability determination requires evaluation of both procedure and substance," *id.*, and "[c]ourts generally have applied a sliding-scale approach to determine overall unconscionability,

---

[91]     (*See* Training at 21 ("I and CVS are obligated to go to arbitration instead of court to resolve legal claims covered by the policy")).
[92]     (*See, e.g.*, Defs. Br. at 12).

considering the relative levels of both procedural and substantive unconscionability," *Delta v. Harris*, 189 N.J. 28, 40 (2006).[93]  Each is discussed in turn below.

Regarding procedural unconscionability, "[t]he instant matter plainly involves a contract of adhesion and therefore *necessarily* involves indicia of procedural unconscionability." *See Rodriguez*, 225 N.J. at 366-67 *(citing Delta,* 189 N.J. at 39 (emphasis added)).[94]   Defendants' purported arbitration policy not only permitted no opportunity for negotiation but *purported to bind Ms. Cornelius instantly merely because she "view[ed] or receive[d]" it*[95]—a procedurally unconscionable "bargaining tactic[]" if there ever was one.  *See id.* ("There was no bargaining here.").  Contrast, *Stelluti v. Casapenn Enterprises*, in which the court upheld a contract of adhesion because "[n]o time limitation was imposed on [the adhering party's] ability to review and consider whether to . . . agree[]."  *See* 203 N.J. 286, 302 (2010).  Amidst the *instant* adhesion applied here, Ms. Cornelius's livelihood hung in the balance, suggesting powerful "economic compulsion motivating the 'adhering' party." *See Delta*, 189 N.J. at 39-40.  Compounding the compulsion was Defendants' double omission in failing to disclose—in both the "Policy" *and* the "acknowledgement"—that employees cannot be retaliated against for opting out.[96]

Additional facts also "suggest a high level of procedural unconscionability."  *See Delta*, 189 N.J. at 40.  For one, Defendants had "superior bargaining power and [were] the more

---

[93]    This analysis falls under "four factors . . . deserving of attention when a court is asked to declare a contract of adhesion unenforceable."  *See Delta v. Harris*, 189 N.J. 28, 40 (2006) (citing *Rudbart v. N. Jersey Dist. Water Supply Comm'n,* 127 N.J. 344, 356 (1992)).  Those factors are "(1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the 'adhering' party, and (4) the public interests affected by the contract" and are analyzed herein.  *See id.*
[94]    "[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars."  *Rudbart*, 127 N.J. at 353.
[95]    ("Guide" at 7; "Policy" at 2).
[96]    (*See supra*, Section II(A)2(3)-(4)).

24

sophisticated party in the transaction"—even one that "employs thousands of people across the country"[97] while operating "retail locations in all 50 states"[98]—while Ms. Cornelius is a "layperson without any specialized knowledge about contracts generally or [arbitration agreements] specifically."  *See Stelluti*, 203 N.J. at 301.  For another, "the particular setting existing during the [putative] contract formation process"—Defendants' misleading "training" with confusing and inconsistent "embedded" documents[99]—also shows procedural unconscionability.  *See Rodriguez*, 225 N.J. at 366.  Defendants' "unduly complex contract terms" do the same:  For instance, the "Scope" of Defendants' arbitration policy—inconsistently with Defendants' "guide"[100] —confusingly contains an "except" clause that embeds an "unless" clause:  "This Policy applies to . . . employees . . . except [some] employees . . . unless [a separate agreement] contains [certain] language[.]"[101] Other inconsistent and confusingly complex aspects of Defendants' morass of arbitration-related documents are discussed above.

But even the showing of those facts "suggest[ing] a high level of procedural unconscionability" "does not, by itself, render the [purported] arbitration agreement unenforceable."  *See Delta*, 189 N.J. at 39-40 (requiring "a fact-sensitive analysis in each case" (citing *Muhammad*, 189 N.J. at 15-16)).  Such a high level of procedural unconscionability does, however, tip the "sliding-scale" toward a finding of *substantive* unconscionability here as well. *See Delta*, 189 N.J. at 40.  Defendants' inexplicably "harsh or unfair one-sided terms," *see Muhammad*, 189 N.J. at 15, which "frustrate[] public policy," *see Rodriguez*, 225 N.J. at 352,

---

97          (*See* Compl. ¶ 4).
98          (Defs. Br. at 7-8 n.2).
99          (*See, e.g.*, *supra*, Section II(A)2).
100         (*See supra*, Section II(A)2 (discussing numerous inconsistencies in the "guide")).
101         (*See* "Policy" at 1 (" This Policy applies to . . . employees . . . except [some] employees . . . unless [a separate agreement] contains [certain] language . . . .")).

therefore easily complete the showing of substantive unconscionability required to "render the [purported] arbitration agreement unenforceable." *See Delta*, 189 N.J. at 39-40.

The Court of Appeals has "consistently recognized that arbitration provisions that confer an 'unfair advantage' upon the party with greater bargaining power are substantively unconscionable." *See, e.g.*, *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 204 (3d Cir. 2010) (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267 (3d Cir. 2003)). As shown especially by Defendant's oppressively one-sided opt-out policy,[102] Defendants' purported arbitration agreement is marked by such "unfair advantage." *See id.*[103]

The misguided effort to deny Ms. Cornelius her day in court depends exclusively on her alleged failure to "opt out" of Defendants' purported arbitration policy.[104] But as discussed above,[105] Defendants' opt-out policy is not expressed consistently across its "training" documents and the two most important documents—the "Policy" itself and the "acknowledgement"—fail to disclose that Ms. Cornelius cannot be retaliated against for opting out. Regarding the substance of the opt-out policy itself, Defendants impose an intricate and arbitrarily time-limited procedure for opting out on employees,[106] *but they impose no restrictions on their own ability to opt-out of their purported policy at any time, including indefinitely into*

---

[102] As discussed above, Defendants' opt-out policy is not expressed consistently across its misleading "training" documents; and the two most important documents—the "Policy" (D.E. No. 9-3) and the "acknowledgment" (D.E. No. 9-4 at 21)—flatly fail to mention that an employee cannot be retaliated against for opting out. In fact, the "Policy" does not mention opting out at all. This inconsistency and source of confusion further proves unconscionability.

[103] Defendants correctly recognize that there would be no necessary problem with a fair and lawful opt-out provision in connection with an arbitration agreement. (*See* Defs. Br. at 12-13). As detailed below, however, Defendants' provision is not even close.

[104] (*See, e.g.*, Defs. Br. at 6; *id.* at 12 (mentioning opting out eight times on one page)) .

[105] (*See supra*, Section II(A)2(3)-(4)).

[106] (*See, e.g.*, Training at 21 (requiring that an opt-out notice from an employee be (i) "mail[ed]" (ii) "written" (iii) "signed" (iv) "dated" (v) "stating clearly" (vi) to "P.O. Box 969" (vii) and "postmarked no later than 30 days after the date [an employee] *received*" the "Policy")).

*the future*.[107] That provision is "particularly unreasonable" because it is "inflexible and one-sided," *see Nino*, 609 F.3d at 203, in decisively favoring the party with "superior bargaining power and . . . more sophisticat[ion]," *see Delta*, 189 N.J. at 40.   It is also "particularly unreasonable" because the meager thirty-day opt-out window Defendants' closed nine years ago was "unduly favorable" to Defendants, *see Nino*, 609 F.3d at 203, in failing to permit enough time to consult an attorney even to employees who may have had claims already.  *See, e.g.*, *Rodriguez*, 225 N.J. at 363 ("The individual may not immediately realize that he or she has been a victim of discrimination.").  Defendants' subjugation of the right to seek legal counsel to the imperative that employees "*will* raise any questions . . . to [a] supervisor"[108] amplifies this "unduly favorable" quality of the purported arbitration agreement.  *See Nino*, 609 F.3d at 203.

On the flip side of that unfair coin, Defendants provided themselves an automatic and costless opt-out—requiring no action on their part, let alone the seven-element process that costs money and was imposed on employees.[109]  So heads Defendants win; tails Ms. Cornelius loses: The national megacorporation gets a jury trial whenever it wants, but the unsophisticated employee can never have a jury trial ever again, simply because she did not opt for one during an arbitrary window amounting to less than 0.02% of her career nine years ago.  Precisely this kind of vast disparity in rights among the parties has been "consistently recognized [as] substantively unconscionable."  *See, e.g.*, *Nino*, 609 F.3d at 202-04 (ruling that "a thirty-day filing requirement in an arbitration agreement is substantively unconscionable").  Defendant's extreme and eternal opt-out policy is downright "oppressive."  *See Martindale v. Sandvik*, 173 N.J. 76, 91 (2002).  At

---

[107]     (*See, e.g.*, Training at 21).
[108]     (*See* Training at 20 (emphasis added); *supra*, Section II(A)2(7)).
[109]     (*See supra*, note 106; "Guide" at 8 ("[I]f a colleague opts out, CVS Health will not be required to arbitrate any disputes it has with that colleague.")).

a minimum, it "must be severed from the [purported] agreement," *see Delta*, 189 N.J. at 46, resulting in the same practical effect as that required by 9 U.S.C. § 402.[110]

The public interest here clearly militates in favor of "one of the oldest and most fundamental of rights."  *See Allstate*, 222 N.J. at 134.  Defendants' defective effort to deny Ms. Cornelius access to court must be rejected.

## CONCLUSION

The plain text of the *Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021* cleanly decides this dispute.  But should the Court wish to "wade into [the] morass," *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 697 (D.N.J. 1992), of Defendants' "training" documents, several independently dispositive reasons will also establish that Defendants' purported arbitration agreement is of no effect.

Accordingly, Ms. Cornelius respectfully requests that the Court deny Defendants' motion.

\*      \*      \*

Respectfully submitted,                                         **Dated:** June 20, 2023

/s/ Alex G. Leone
**Alex G. Leone (212572017)**
**LEONE LAW LLC**
**195 Maplewood Avenue**
**Suite 1, P.O. Box 1274**
**Maplewood, New Jersey 07040**
**alex@juvenilejusticeattorney.com**
**(908) 787-5581**

---

[110]      (*See supra*, Section I; *see also* "Policy" at 4 (providing for "Severability")).

## CERTIFICATE OF SERVICE

Alex G. Leone hereby certifies that this filing is served electronically on all parties in this matter through their counsel on June 20, 2023.  *See* L. Civ. R. 5.2 § 14(b)(1).

Respectfully submitted,

<u>/s/ Alex G. Leone</u>                                                    **Dated:** June 20, 2023
**Alex G. Leone (212572017)**
**LEONE LAW LLC**
**195 Maplewood Avenue**
**Suite 1, P.O. Box 1274**
**Maplewood, New Jersey 07040**
**alex@juvenilejusticeattorney.com**
**(908) 787-5581**

29